UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LORI MARIE McCOLMAN,

       Plaintiff,

                                     Case No. 09-11334

                                     Paul D. Borman
v.                                     United States District Judge


ST. CLAIR COUNTY, ST. CLAIR
COUNTY SHERIFF'S DEPARTMENT,
DEPUTY GREG DOAN and SGT.
HERNANDEZ, in their official and unofficial
capacity, jointly and severally,

       Defendants.
_____/

### OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 15)

     This matter is before the Court on Defendants St. Clair County, St. Clair County Sheriff's Department, Deputy Greg Doan and Sgt. Hernandez' Motion for Summary Judgment. (Dkt. No. 15.) Plaintiff has filed a response (Dkt. No. 20) and Defendants filed a reply (Dkt. No. 21.) The Court held a hearing on September 29, 2010. For the reasons that follow, the Court GRANTS Defendants' motion.[1]

_____

[1] The instant motion was briefed by the parties in anticipation of a stipulated dismissal with prejudice of all Defendants except for Deputy Doan. On April 14, 2010, the Court entered a Stipulated Order Dismissing Count IV of Plaintiff's Complaint (Municipal Liability) and dismissing Defendants St. Clair County, St. Clair County Sheriff's Department and Sgt. Joseph Hernandez with prejudice.

  While Plaintiff named Deputy Doan in his "official and unofficial capacity," individuals sued in

**INTRODUCTION**

This case arises from Plaintiff's arrest for drunk driving in the early morning hours of August 28, 2008. Plaintiff, a double below-knee amputee, claims that the arresting officer, Deputy Greg Doan, used excessive force in the arrest by vigorously pulling her across the seat as she entered the police car.[2] Plaintiff also claims that Deputy Doan was grossly negligent in (1) leaving her situated at an angle in the back seat of the patrol car, resulting in her falling sideways on the back seat and hitting her head on the car door when the car turned a corner within a block of starting to the jail and (2) failing to prevent her fall from an exam table to the floor at the hospital. Plaintiff also claims that one or more of the above acts constituted an assault and battery.

Deputy Doan responds that he did not use excessive force when he pulled Plaintiff across the back seat, that he was not grossly negligent when he situated her sideways in the car to

_____

their official capacities stand in the shoes of the entity they represent. *Alkire v. Irving*, 330 F.3d 802, 810 (6th Cir. 2003) (citing *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)). Accordingly, "[a] suit against an individual in his official capacity is the equivalent of a suit against the governmental entity." *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994). Consequently, Plaintiff's claim against Deputy Doan in his official capacity is duplicative of her claim against St. Clair County and St. Clair County Sheriff's Department, which Plaintiff has dismissed with prejudice. Accordingly, this case proceeds only against Deputy Doan in his individual capacity on Count I (Gross Negligence), Count II (Excessive Force) and Count III (Assault and Battery).

[2] Plaintiff also argued, in her response to Defendant's motion to dismiss, that officers used excessive force in handcuffing her too tightly, which Plaintiff alleges resulted in injury to her hands and wrists. Plaintiff's Complaint does not plead a handcuffing claim, indeed the Complaint does not mention the fact that Plaintiff's handcuffs were too tight. At the hearing on Defendant's motion to dismiss, the Court instructed Plaintiff's counsel that if Plaintiff wished to proceed on the handcuffing claim, Plaintiff would have to file an amended complaint pleading such a claim. Plaintiff's counsel acknowledged that the Complaint did not plead the handcuffing claim, and counsel indicated that he would file an amended complaint. Over a month has passed since the September 29, 2010 hearing on Defendant's motion to dismiss and Plaintiff has not filed an amended complaint. Therefore, the Court will not address Plaintiff's handcuffing claim, which is not properly before the Court.

accommodate her disability and that he was not grossly negligent with regard to her fall from a hospital exam table, when he was down the hall at the time and had left another officer in charge of monitoring Plaintiff while she waited on the exam table. Deputy Doan denies that he committed an assault and battery.

## I.    BACKGROUND

Plaintiff, a 51 year old female, was arrested for drunk driving by Deputy Doan and Sgt. Hernandez, on August 28, 2008. Plaintiff is a double below-knee amputee, who ambulates with the use of prosthetic legs, and who has been working twenty some years with her disability. (Def.'s Mot. Ex. 1, Deposition of Lori Marie McColman, August 14, 2009, 6, 16-18.) Her amputations are the result of complications from an auto-immune disease, and she also suffers from discoid lupus, which causes lesions on the top of her head. (*Id*. at 18.) Plaintiff also has vasculitis, which results in swelling and pain in her hands, and suffers from other conditions related to her auto-immune disorder. (*Id*. at 21-22.) On July 14, 2008 Plaintiff married her current husband, Donald McColman, who is 81 years old. (*Id*. at 7-8.) She currently receives social security disability benefits and has no plans to return to work. (*Id*. at 18.)

### A.    The August 22, 2008 Domestic Disturbance Call

On August 22, 2008, Deputy Doan and Sgt. Hernandez were called to Plaintiff's marital home on Ridge Road, which she shared with her husband Donald McColman. On that occasion, as Plaintiff and her husband were arguing, she came at him as he was sitting in his recliner, he pushed her back with his feet, she fell, hit her head and blacked out. (*Id*. at 11-12; Def.'s Mot. Ex. 3, Deposition of Donald McColman, February 10, 2010, 16-17.) Mr. McColman called 911 and Deputy Doan and Sgt. Hernandez responded to the call. (Def.'s Mot. Ex. 1, McColman Dep. 11.)

There had been a fire in the course of the altercation, caused by Plaintiff who, according to her husband, set "[their] marriage certificate or something" on fire. (Def.'s Mot. Ex. 3, Donald McColman Dep. 16.) Deputy Doan and Sgt. Hernandez separated Plaintiff and her husband, sent Plaintiff to her own home in Port Huron and concluded that the altercation was mutual, with both parties at fault. (Def.'s Mot. Ex. 2, Incident Report.) Following the dispute, Plaintiff's husband filed for divorce, but withdrew the complaint after he and Plaintiff reconciled. Mr. McColman filed for divorce a second time, in November, 2009, and testified that he has withdrawn that filing as well and that the parties are currently reconciled. (Def.'s Mot. Ex. 3, Donald McColman Dep. 8-9.)

**B.      Plaintiff's August 28, 2008 Arrest for Drunk Driving - The Instant Incident**

On the evening of August 27, 2008 Plaintiff, who was then separated from her husband and living at her home on Court Street in Port Huron, had "several" drinks of whiskey at home alone and decided to go out to look for some fast food. (Def.'s Mot. Ex. 1, McColman Dep. 27-28, 30-32.) Plaintiff was stopped by Deputy Doan and Sgt. Hernandez, who arrived in separate patrol cars. (*Id.* at 39; Def.'s Mot. Ex. 5, Incident Report.) They approached the car and asked Plaintiff to produce her license and registration which she did. They then asked her to get out of the car so they could perform a field sobriety test. Plaintiff explained that she was a double amputee and that she might not be able to perform the tests, but the officers told her this would not be an impediment to completing the tests and Plaintiff got out of the car. (Def.'s Mot. Ex. 1, McColman Dep. 40-42.) Plaintiff remembers that she was asked to recite the alphabet backwards and "didn't do so well." (*Id.* at 42-43.) Deputy Doan's Incident Report indicates that in fact he had Plaintiff repeat the alphabet in a forward manner, not reverse. (Def.'s Mot. Ex. 5, Incident Report.) Shortly after approaching Plaintiff's car, Deputy Doan recognized Plaintiff as the individual, a double amputee,

who had been involved in a domestic dispute with her husband a couple of weeks before. (Def.'s Mot. Ex. 6, Deposition of Gregory Doan, October 19, 2009, 18.)

Plaintiff recalls that she was asked to take and did take a breathalyzer test. Plaintiff testified that the reading was an over-the-lawful-limit .18, and that she was immediately placed in handcuffs. (Def.'s Mot. Ex. 1, McColman Dep. 42-43; Def.'s Mot. Ex. 5, Incident Report.) Deputy Doan placed Plaintiff in handcuffs pursuant to departmental policy which requires that detainees be handcuffed behind their backs when being transported in St. Clair County Sheriff's Office vehicles and remain in handcuffs until turned over to corrections staff at the jail. (Def.'s Mot. Ex. 8; Def.'s Mot. Ex. 5, Incident Report.) In fact, Deputy Doan had been disciplined on a prior occasion for removing a detainee's handcuffs while at the hospital, which resulted in the detainee's escape. (Def.'s Mot. Ex. 6, Doan Dep. 8-9.)

Plaintiff testified in her deposition that immediately upon being placed in handcuffs, she told the officers that the handcuffs, placed on her hands behind her back, were too tight and were hurting her, "cutting into her skin." (Def.'s Mot. Ex. 1, McColman Dep. at 44-45.) She testified that the officers did not adjust the handcuffs in response to her complaints. (*Id.* at 45.) Deputy Doan testified that when Plaintiff complained that the handcuffs were hurting her, that he checked them and they "weren't tight at all," and after performing a test, he concluded that "they were fine." (Def.'s Mot. Ex. 6, Doan Dep. 26-27.) Deputy Doan explained that to check for tightness an officer attempts to insert a finger on the wrist bone, and if it fits in that spacing, the handcuffs are not too tight. (*Id.*)

Plaintiff was then told to sit on the backseat of the patrol car and to "scoot" across the seat and into the car. Plaintiff does not recall how she got from a standing position to sitting on the edge

of the backseat of the patrol car. (Def.'s Mot. Ex. 1, McColman Dep. 47.) She told the officers that she couldn't scoot without the use of her hands which were handcuffed behind her back. Plaintiff testified that Sgt. Hernandez then went around to the opposite side of the car and "yanked" her across the seat. (*Id.* at 46-48.) Plaintiff testified that Sgt. Hernandez' pulling her across the seat caused "excruciating pain," and caused one of her prostheses to fall off. (*Id.* at 46.) Deputy Doan testified that in fact it was he who pulled Plaintiff across the seat, not Sgt. Hernandez. (Def.'s Mot. Ex. 6, Doan Dep. 28.) Deputy Doan testified that he knelt with one leg on the seat and one outside the vehicle, grabbed Plaintiff by her arms and pulled her into the vehicle. He testified that Plaintiff never complained that he was hurting her when he pulled through. (*Id.* at 28-29.) Deputy Doan testified that he left Plaintiff sitting sideways on the seat because he thought that she would have difficulty getting her legs and feet around and underneath the cage with her prostheses. (*Id.* at 47-48.) Sgt. Hernandez confirmed that he did not assist Deputy Doan in placing Plaintiff in the patrol car at the scene of the stop. (Def.'s Mot. Ex. 7, Deposition of Joseph Hernandez, October19, 2009, 20.)

Plaintiff testified that one of the officers, she can't recall which one, put her prosthesis back on without securing it well, but somehow, she can't specifically recall, her legs were inside the car. She testified that she was not well situated on the seat, and without the use of her hands could not adjust her position, but she did not complain about this at the time. As a result of her sitting sideways, when the car turned a corner, she fell over and hit her head (she is not sure which part of the car she hit) in one of the spots where she had a pre-existing lesion. (Def.'s Mot. Ex. 1, McColman Dep. 49-52.) Plaintiff testified that she then passed out because of the combination of the excruciating pain in her wrists and the pain in her head. Deputy Doan confirms that he heard

a "slight thump" when he turned a corner and that he called to Plaintiff but she did not respond. (Def.'s Mot. Ex. 5, Incident Report p. 3.) He stopped the car and got out to check on her, found her breathing and moving but still not responding. At this point, Deputy Doan called Sgt. Hernandez who recommended that Deputy Doan take Plaintiff to the hospital to be checked. (Def.'s Mot. Ex. 6, Doan Dep. 33-43.)

**C.    Plaintiff's Visit to Port Huron Hospital and Transfer to St. Clair County Jail**

Plaintiff next remembers waking up at Port Huron Hospital. (Def.'s Mot. Ex. 1, McColman Dep. 52.) She doesn't remember how she got there, but somehow Plaintiff ended up seated at the foot of an exam table and in the process of trying to secure her one loose prosthesis, she fell off the exam table to the floor. (*Id*. at 54-55.) Deputy Doan testified that he and Deputy Stoyan, whom Deputy Doan had called to assist him at the hospital, helped Plaintiff onto a gurney and an orderly took her into an exam room. (Def.'s Mot. Ex. 6, Doan Dep. 48-53.) Deputy Stoyan testified that Plaintiff was only placed on a gurney when she was in the exam room, which was not just a curtained space but was a room with four walls and a door. (Def.'s Mot. Ex. 9, Deposition of Martin Stoyan, October 19, 2009, 13, 17.) Deputy Stoyan stood by and watched Plaintiff while Deputy Doan went to fill out the paperwork for Plaintiff's blood draw. (Def.'s Mot. Ex. 5, Incident Report, p. 3-4; Def.'s Mot. Ex. 9, Stoyan Dep. 17-18.) Plaintiff testified that no one was in the room at the time she fell off of the exam table. (Def.'s Mot. Ex. 1, McColman Dep. 57.) She testified that she fell to the floor on her right elbow and that the officer (Plaintiff testified that it was Deputy Doan but in fact it was Deputy Stoyan) told the nurse to leave Plaintiff where she was because she was playing games. (*Id*; Def.'s Mot. Ex. 9, Stoyan Dep. 29-30.) Deputy Doan testified that as he was returning from the nurse's station he saw Plaintiff start to fall and that Deputy Stoyan reached for

her and caught her as she was falling. Deputy Doan testified that Plaintiff was returned to the exam table and the nurse then drew her blood. (Def.'s Mot. Ex. 6, Doan Dep. 53-56.)

Deputy Stoyan testified that he was in the room with Plaintiff at all times and that she continued to 'scoot forward' on the gurney until one of her prosthetic legs fell off. A nurse came in and reattached it and then Plaintiff again started to lean forward until she began to fall at which time Deputy Stoyan scooped her up and eased her to the ground. (Def.'s Mot. Ex. 9, Stoyan Dep. 24-25.) Deputy Stoyan stated that Plaintiff weighed around 175 pounds. (*Id*. at 35.) Deputy Stoyan testified that he left Plaintiff on the floor afer she fell because she was 'babbling drunk' and if "she is going to try to fall off head first on the floor, she can stay on the floor." (Def.'s Mot. Ex. 9, 28-29.) Deputy Stoyan was of the opinion that Plaintiff took a dive off of the table in a deliberate effort to injure herself. (*Id*. at 30-31.) Deputy Stoyan testified that Plaintiff was returned to the exam table for her blood draw. (*Id*. at 29.) Plaintiff testified differently and recalled that the nurse proceeded to draw Plaintiff's blood while she lay on the floor. (Def.'s Mot. Ex. 1, McColman Dep. 59-60.) Plaintiff was still handcuffed when she fell off the exam table. (Def.'s Mot. Ex. 6, Doan Dep. 57-58.) Both Deputy Doan and Sgt. Hernandez testified that the fact that Plaintiff fell off the exam table should have been noted in the police report and acknowledged that it had not been mentioned. (Def.'s Mot. Ex. 6, Doan Dep. 22-23; Def.'s Mot. Ex. 7, Hernandez Dep. 27-29, Def.'s Mot. Ex. 5, Incident Report Narrative.)

At some point at the hospital, Plaintiff recognized Deputy Doan as one of the officers who had been to her home the night of the domestic dispute. (Def.'s Mot. Ex. 1, McColman Dep. 57-58.) Plaintiff testified that she was experiencing excruciating pain at the hospital in her wrists and hands which were going numb, and in her right elbow. (*Id*. at 61.) Deputy Doan testified that he and

Deputy Stoyan put Plaintiff back in the patrol car to transport her to the jail. (Def.'s Mot. Ex. 6, Doan Dep. 62-63.) Plaintiff was transported from the hospital to the jail (she cannot recall how she got from the hospital floor to the jail) and did not report any type of injury to anyone at the jail. (Def.'s Mot. Ex. 1, McColman Dep.62-65.) Plaintiff's handcuffs remained on until they were removed by corrections officers at the jail. (Def.'s Mot. Ex. 6, Doan Dep. 66.) Plaintiff did not report to anyone at the jail that Deputy Doan or Sgt. Hernandez had treated her improperly in any way. (Def.'s Mot. Ex. 1, McColman Dep. 65.) Notes from her intake at the jail indicate that Plaintiff complained of pain in her right arm from a domestic dispute with her husband the week before. (Def.'s Mot. Ex. 11.) The notes also indicate that Plaintiff readjusted her prosthetic legs without assistance and was using her right arm that she said she could not use when she arrived. (*Id.*) Plaintiff pled guilty to drunk driving and was sentenced to six months probation. (Def.'s Mot. Ex. 1, McColman Dep. 16.)

### D. The Physical and Medical Evidence

Plaintiff took several pictures of what she alleges are bruises caused by her "interaction" with the police that evening. She states that the pictures of her fingers, which were taken in April of 2009 (almost 9 months after the incident) show swelling caused by the handcuffing. (*Id*. at 88; 94-95.) She states that she first began experiencing numbness, pain and swelling in her fingers after the handcuffing. (*Id*. at 105-106.) Plaintiff produced one picture of her wrist, which she claims was taken within two days of her arrest, which she alleges shows redness and bruising from the handcuffing. (*Id.* at 97-98.) When questioned about the photographs at her deposition, Plaintiff could not always identify which arm (left or right) was being photographed and could not say which bruises were caused by which actions of the arresting officers, just that they all occurred as a result

of the "interaction." (*Id*. at 69-78.) She claims that the photos showing the bruising to her arms were taken the day after the accident when she visited her family physician. (*Id*. at 76-78.)[3]

The Port Huron Hospital Emergency Nursing Record, completed when Plaintiff was taken to the hospital the night of her arrest, notes as to the evaluation of Plaintiff's skin "echymosis, 3 spots right arm, 1 spot left arm." This indicates that the intake nurse noted bruising (echymosis) on Plaintiff's arms that evening, although the report does not indicate where on Plaintiff's arm the bruising appeared. (Def.'s Mot. Ex. 10, p. 3.) The Emergency Physician Report from that evening does not note bruising and medically clears Plaintiff to go to jail. (*Id*. p. 6.)

The day after the arrest, on August 29, 2008, Plaintiff went to see her family physician, Dr. Michele Raymond, but since she was out that day, Plaintiff was seen by a Dr. Bazo. (Def.'s Mot. Ex. 14, Deposition of Dr. Michele Raymond, March 8, 2010, p. 16.) Neither Plaintiff nor Defendant deposed Dr. Bazo in this case but Dr. Raymond was questioned at her deposition about Dr. Bazo's notes from Plaintiff's visit on August 29, 2008. Dr. Bazo's notes, as interpreted by Dr. Raymond, indicate, among other things, that Plaintiff stated she had been abused by Deputy Doan and was experiencing bilateral hand numbness. (*Id*. at 16-17.) Dr. Bazo's notes further indicate that Plaintiff complained of pain in her right elbow and left wrist and Dr. Bazo indicated "positive bruise" near the entry regarding Plaintiff's wrist. (*Id*. at 19.) In the diagnosis section, Dr. Bazo indicated "bilateral hand numbness." (*Id*. at 19-20.) The notes further indicated that the x-rays were negative

---

[3] The Court notes that at the hearing on this matter, Counsel for Deputy Doan pointed out to the Court that certain of the photographs of the bruises on Plaintiff's arms were actually taken more than a week before her arrest, on August 23, 2008, the day after the domestic dispute to which officers Doan and Hernandez responded at Plaintiff's home. Plaintiff's counsel did not deny that certain of these photographs were taken before Plaintiff's arrest and thus could not depict injuries sustained in the course of her arrest on August 28, 2008.

at that time.  When Plaintiff saw Dr. Raymond six days later on September 4, 2008, Plaintiff reported that the numbness in her hands had subsided.  (*Id*. at 24.)

When Plaintiff saw Dr. Raymond on September 11, 2008, Plaintiff went into more detail about the events of the night of August 28, 2008, informing Dr. Raymond that she had been "manhandled" by police and handcuffed behind her back and that ever since her hands were numb. (*Id*. at 25.)  On that date, Plaintiff had diagnostic indications that could be a positive sign for carpal tunnel syndrome exacerbation.  (*Id*. at 26.)  While Dr. Raymond did not see evidence of bruising on this visit, she stated that the handcuffing behind Plaintiff's back could possibly have exacerbated her carpal tunnel.  (*Id*. at 28-29.)  Dr. Raymond testified that Plaintiff never mentioned that her handcuffs were too tight.  (*Id*. at 30, 49-50.)  Dr. Raymond testified that she could not say that the swelling in Plaintiff's hands was caused by the events of the evening of her arrest because that swelling could be due to Plaintiff's history of vasculitis and further opined that the vasculitis would not have been aggravated by the events of the arrest.  (*Id*. at 62.)

On February 11, 2010 Plaintiff visited Dr. Raymond to discuss this lawsuit, and to see if Dr. Raymond believed that the exacerbation of Plaintiff's carpal tunnel was caused by events that occurred on the evening of her arrest, specifically by the handcuffing.  Dr. Raymond testified that it is her opinion and belief that Plaintiff's "worsening is due to the incident."  (*Id*. at 46.)  Dr. Raymond testified that Plaintiff's carpal tunnel could have flared up for reasons unrelated to the handcuffing but that Plaintiff's episodes of carpal tunnel had increased in frequency since the handcuffing.  (*Id*. at 47, 51.)  Dr. Raymond responded affirmatively to the question of whether "in [her] medical opinion, that the injury to Plaintiff's hands and elbow were [sic] caused by the handcuffing."  (*Id*. at 57-58.)  Although Plaintiff had treated with Dr. Raymond for over two years,

Plaintiff had not mentioned her history of carpal tunnel to Dr. Raymond until after the arrest, on the September 11, 2010 visit, and never told Dr. Raymond that she was disabled in the past from working due to carpal tunnel syndrome.  (*Id*. at 21, 27-28.)

Plaintiff claims significant pain in her right elbow as a result of the fall she took from the examining table in the hospital, which she admits she fell off of on her own.  (Def.'s Mot. Ex. 1, McColman Dep. 90, 93-94.)  X-rays of her elbow on September 2, 2009, when she visited her family doctor Dr. Michele Raymond were negative and she has never received any further treatment for her elbow pain.  (*Id*. at 99-101.)  Also, there was no fluid in the elbow joint at the time of the negative x-ray.  (Def.'s Mot. Ex. 14, Raymond Dep. 19, 21.)  There were also no ligament or tendon disruptions and "no visualized abnormalities."  (*Id*. at 21-22.)  With respect to Plaintiff's complaints about her elbow pain, the first time that Plaintiff mentioned to Dr. Raymond  that she injured her elbow falling off of the exam table was on May 29, 2009, nine months after the incident.  X-rays were repeated and were negative.  (*Id*. at 41-42.)  Dr. Raymond testified that Plaintiff had a history of vasculitis that often resulted in Plaintiffs' hands being red and swollen.  (*Id*. at 39-40.)  Dr. Raymond testified that Plaintiff had suffered from vasculitis for years and that it was the cause of her amputations.  (*Id*. at 40-41.)  Dr. Raymond also testified that the lesions that appear chronically on Plaintiff's scalp are from her discoid lupus and present as "scaling, reddish, flaking."  (*Id*. at 54.)

## II.    STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56, a party against whom a claim, counterclaim, or cross-claim is asserted may "at any time, move with or without supporting affidavits, for a summary judgment in the party's favor as to all or any part thereof." Fed. R. Civ. P. 56(b). Summary judgment is appropriate where the moving party demonstrates that there is no genuine

issue of material fact as to the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323; *See also Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting Black's Law Dictionary 881 (6th ed. 1979)) (citations omitted). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial. *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993). In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-23. The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must

set forth specific facts which demonstrate that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). The rule requires the non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment). "'The central issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010) (quoting *In re Calumet Farm, Inc.*, 398 F.3d 555, 558 (6th Cir. 2005)).

## III. ANALYSIS

Plaintiff alleges in her Complaint what appear to be three separate acts on the part of Deputy Doan that form the basis for Plaintiff's claims: (1) that Deputy Doan pulled Plaintiff across the back seat of the patrol car by her arms, causing bruising to Plaintiff's arms; (2) that Deputy Doan placed Plaintiff, who was unable to use her hands to stabilize herself, in an unsecure position in the back of the patrol car, resulting in her falling over on the seat and injuring her scalp; and (3) that Deputy Doan left Plaintiff unattended on an exam table at the hospital with her hands still cuffed behind her back and resulting in her falling off of the exam table onto the floor, causing injury to her elbow.

Plaintiff's Complaint does not specify which of these acts constitute excessive force and which constitute gross negligence and/or assault and battery. It appears from Plaintiff's responsive brief, which does little to clarify her claims, that the "pulling" claim is alleged to have been excessive force and the failure to secure Plaintiff in the back seat of the car and on the exam table at the hospital are alleged to have been grossly negligent. Plaintiff's claim of assault and battery is

14

not addressed at all in her responsive brief.

A.       The Alleged Use of Excessive Force - 42 U.S.C. § 1983 (Count II)

Plaintiff claims that Deputy Doan used excessive force in pulling Plaintiff across the backseat of the vehicle by her arms when she was unable to "scoot" herself across, causing bruising to her arms. Plaintiff brings this action pursuant to 42 U.S.C. § 1983, alleging that Deputy Doan violated her constitutional right to be free from excessive force. Claims regarding an officer's use of excessive force in the context of an arrest or other seizure are governed by the Fourth Amendment: "Where, as here, the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment." *Graham v. Connor*, 490 U.S. 386, 394 (1989). The determination as to whether the officer has exerted excessive force during the course of seizure is determined under an "objective reasonableness" standard. *Id.* at 396-97. "The 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id*. at 397. The Court analyzes the challenged conduct from the "perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396.

In analyzing the claim, the Court must pay "careful attention to facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. The inquiry necessarily entails balancing individual rights

with governmental interests:

> Determining whether the force used to effect a particular seizure is "unreasonable" under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or an investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. . . . Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment.

490 U.S. at 396-397 (internal quotation marks and citations omitted).

Deputy Doan asserts that, even assuming a constitutional violation occurred, he is entitled to qualified immunity. Under the doctrine of qualified immunity, a governmental official, including a police officer, will not be held liable under section 1983 if his conduct does not violate clearly established constitutional rights of which a reasonable officer in the defendant's position would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

The Sixth Circuit has held that "the right to be free from excessive force is a clearly established right for purposes of the qualified immunity analysis." *Kostrzewa v. City of Troy,* 247 F.3d 633, 641 (6th Cir. 2001) (quoting *Martin v. Heideman*, 106 F.3d 1308, 1313 (6th Cir. 1997)). Consequently, as the Sixth Circuit explained in *Kostrzewa*, in an excessive force case the controlling issue is whether the officer's conduct was objectively reasonable under the circumstances:

> It is clear from this circuit's analyses in various excessive force decisions that, having concluded that the right to be free from excessive force is clearly established, whether we grant qualified immunity in a particular case depends upon whether the officer did, in fact, use excessive force (*i.e.*, force that was not objectively reasonable). To put it another way, if there is a genuine issue of fact as to whether an officer's use of force was objectively reasonable, then there naturally is a genuine issue of fact with respect to whether a reasonable officer would have known such conduct was wrongful.

247 F.3d at 642-643. Thus, where a genuine issue of fact exists as to whether the officer used force

that was objectively reasonable, it is error to grant the officer qualified immunity. *See also Patrick v. Vrablic*, No. 04-cv-73270, 2005 WL 3088346 at * 8 (E.D. Mich. Nov. 16, 2005) ("[I]n this case a genuine issue of fact exists as to whether Defendant Vrablic's handcuffing of Plaintiff amounts to excessive force. This same factual issue precludes summary judgment on qualified immunity grounds.").

While several courts have applied the *Kostrzewa* analysis to conclude that the finding of an issue of fact on the reasonableness of an officer's conduct precludes a grant of qualified immunity in an excessive force case, in certain circumstances the Sixth Circuit has engaged in the qualified immunity analysis notwithstanding a finding of fact on the objective reasonableness of the officer's conduct. In these cases, the court has recognized that "the qualified immunity inquiry . . . has a further dimension . . . that acknowledge[s] that *reasonable mistakes* can be made" and that "protect[s] officers from the sometimes hazy border between excessive force and acceptable force and in addition to the deference officers receive on the underlying constitutional claim, qualified immunity can apply in the event the mistaken belief was reasonable." *Vance v. Wade*, 546 F.3d 774, 784 (6th Cir. 2009) (internal quotation marks and citations omitted) (emphasis in original). *See also Miller v. Sanilac County*, 606 F.3d 240, 254 (6th Cir. 2010) (noting, in an excessive force case, that "[q]ualified immunity will often operate to protect officers from the sometimes hazy border between excessive and acceptable force," but finding that the case before it did not present "one of those hazy cases.").

The Court must analyze Plaintiff's excessive force claims in segments, as defined by Plaintiff's allegations of separate instances of excessive force. "[The] court analyzes the subject event in segments when assessing the reasonableness of a police officer's actions." *Morrison v.*

*Board of Trustees of Green Twp.*, 583 F.3d 394, 401 (6th Cir. 2009). Plaintiff does not clearly delineate her claims, and does not refer to specific conduct in her separate Counts, but her responsive brief indicates that she claims that officer Doan used excessive force in "pulling" Plaintiff across the back seat of the car by her arms.

Plaintiff was arrested for the offense of driving while under the influence of alcohol, an unquestionably serious crime which can, under certain circumstances, lead to a volatile situation. *Marvin v. City of Taylor*, 509 F.3d 234, 245-246 (6th Cir. 2008). However, unlike the plaintiff in *Marvin* who was actively resisting arrest, Plaintiff in the instant case, a double amputee who was offering no resistance to arrest and was cooperative, other than not listening to Deputy Doan when he read her her chemical test rights, did not pose an immediate threat to the safety of the officers. (Def.'s Mot. Ex. 6, Doan Dep. 40, 60-61.) Nonetheless, Deputy Doan was following departmental policy which required keeping Plaintiff handcuffed behind her back while being transported in an officer's vehicle and remaining handcuffed until turned over to corrections authorities at the jail. (Def.'s Mot. Ex. 8.) Deputy Doan had been disciplined in the past for violating this departmental policy when he removed a detainee's handcuffs at a hospital and the detainee escaped.

Plaintiff testified than when she was placed in the back of the patrol car, with her hands still cuffed behind her back and both of her prostheses hanging over the edge of the seat outside the car, she indicated to Deputy Doan, who told her to "scoot" into the car, that she could not get in the car with her hands handcuffed behind her back because she could not propel herself across the seat without the use of her hands. (Def.'s Mot Ex. 1, McColman Dep. 46.) At this point, Plaintiff testified, instead of acquiescing to her request to remove the handcuffs so she could "scoot" herself across the seat, one of the officers (testimony from the officers confirmed that it was Deputy Doan

who pulled Plaintiff into the car) went around the other side of the car, "opened up that door, grabbed me by both of my arms and forcibly pulled me into the car, at which time one of my prosthesis [sic] fell off." (*Id*.)

Plaintiff testified that when Deputy Doan "yanked" her across the seat it caused "excruciating pain" and that she screamed "[y]ou're hurting me, you're hurting me." (*Id*. at 47-48.) Plaintiff testified that one of her prostheses, which was still hanging out of the car when Deputy Doan "yanked" her across the seat, fell off from the force of being pulled. (*Id.* at 48-49.) Plaintiff claims that the force of the Deputy Doan's pulling her into the car caused extensive bruising on her arms. (Pl.'s Resp. Ex. 3, Photos of Arms.)[4] Plaintiff testified that the officers returned to the other side of the car, picked up her prosthesis off the ground and "started jamming it onto my residual limb" after she told them she could not show them how to put it back on without using her hands. (*Id*. at 49-50.) Plaintiff testified that Deputy Doan declined to release Plaintiff from the handcuffs so that she could assist in putting the prosthesis back on, and that he managed to get it on without her assistance but not securely. (*Id*.)

Plaintiff's claim of excessive force in "pulling" her across the back seat, which Plaintiff alleges resulted in some bruising on her arms, presents that "'scintilla of evidence' of excessive force" that the Sixth Circuit has previously found insufficient to survive summary judgment. *Miller*, 606 F.3d at 253. While Plaintiff claims, and offers alleged photographic evidence, that Deputy Doan's conduct in pulling Plaintiff across the seat by her arms caused bruising to her arms, it is not

---

[4] As the Court noted above, at the hearing on this matter, Deputy Doan's counsel pointed out to the Court that several of these photographs indicate that they were taken before Plaintiff's arrest and thus could not depict injuries sustained in the course of her arrest on August 28, 2008. Plaintiff's counsel did not dispute the fact that several of the photos predate Plaintiff's arrest.

clear that his decision to move her in this fashion was objectively unreasonable under the circumstances. "Law enforcement officers are inevitably required to make difficult, split-second decisions regarding the amount of force needed in a particular situation, and '[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment.'" *Kostrzewa,* 247 F.3d at 639 (quoting *Graham,* 490 U.S. at 396-397). *See also Freels v. County of Tipton*, No. 08-2580-STA, 2010 WL 2364432 at * 10 (W.D. Tenn. June 9, 2010) (applying Sixth Circuit precedent to a claim of excessive force and finding that the force used, which involved shoving and grabbing plaintiff's arm on a misdemeanor arrest, was reasonable under the circumstances: "In effectuating an arrest, law enforcement officers may use a level of force that is reasonably necessary. This force includes placing hands on an arrestee, even one charged with a minor offense such as a misdemeanor.").

Plaintiff testified that she was unable to propel herself across the seat without the use of her hands. Deputy Doan was acting pursuant to department policy which required him to keep Plaintiff, who by all accounts was significantly intoxicated and who in his previous encounter with her at the marital home had indicated aggressive behavior, in handcuffs behind her back while riding in his vehicle. (Def.'s Mot. Ex. 8.) Given these constraints, the Court concludes that Deputy Doan had little choice but to use some force to move Plaintiff, a 180 pound intoxicated woman, across the seat so that he could close the back door of the patrol car. His conduct was not the sort of "gratuitous violence" which the Sixth Circuit has considered significant in evaluating claims of excessive force. *See Miller*, 606 F.3d at 252 ("In determining whether there has been a violation of the Fourth Amendment, we consider not the 'extent of the injury inflicted' but whether an officer subjects a detainee to 'gratuitous violence.'") (quoting *Morrison*, 583 F.3d at 407).

*Lustig v. Mondeau*, 211 F. App'x 364 (6th Cir. 2006) is instructive on this issue. In *Lustig*, plaintiff alleged that the officer "twisted and jerked her right arm, causing pain and permanent injury" following her arrest for operating a watercraft while intoxicated. *Id*. at 370. Plaintiff in *Lustig* alleged that the officer "repeatedly and gratuitously" applied additional force when she was offering only passive resistance. *Id*. at 371. When plaintiff in *Lustig* attempted to close the gate on the boat to keep her puppy from climbing off, the officer twisted her arm and said : "F... the dog." Plaintiff then protested that the officer was hurting her, to which he responded "Good. I love to manhandle women," and proceeded to twist plaintiff's arm harder, lifting it higher behind her back. *Id*. at 366. Eventually, the officer's supervising deputy told him "to ease up." *Id*. The court found that plaintiff, who did not immediately seek medical attention for the alleged injuries but protested loudly at the time that the officer was hurting her, was clearly subdued at the time of the alleged excessive force. The court further found that the district court had made inappropriate credibility determinations at the summary judgment stage in finding that plaintiff's testimony was inconsistent and unreliable. The court concluded that the amount of force used was objectively unreasonable under the circumstances and that the officer was not entitled to qualified immunity because the right to be free from the use of gratuitous force to inflict pain on an already subdued suspect was clearly established.

In the instant case, viewing the facts in the light most favorable to the Plaintiff, the Court concludes that Plaintiff has not offered sufficient evidence to create a genuine issue of fact regarding whether pulling Plaintiff across the seat of the car by her arms was objectively unreasonable under the circumstances. This is not a case where the officer "gratuitously and repeatedly" applied additional force to a passive arrestee - it appears to have been a one-time "yank," which was not

gratuitous but was for the express purpose of getting Plaintiff into the car. The Court concludes that there is no genuine issue of fact but that Deputy Doan did not use objectively unreasonable force when pulling Plaintiff across the back seat of his patrol car. Such conduct, even if there were a question as to its objective reasonableness, would fall within that "hazy border" between excessive and acceptable force - at most an "objectively reasonable mistake" under the circumstances. *Miller*, 606 F.3d at 254. The Court concludes that Deputy Doan is entitled to qualified immunity on Plaintiff's "pulling" claim which allegedly caused bruising to Plaintiff's arms.

### B. Gross Negligence[5] (Count I)

Plaintiff appears to state two separate gross negligence claims: (1) that Deputy Doan was grossly negligent in leaving Plaintiff situated in the back of the car so that she fell in transit and hit her head, and (2) that Deputy Doan left Plaintiff unattended at the hospital, resulting in her falling from an exam table onto the floor and injuring her elbow. Under Michigan law, police officers are liable in tort only for actions deemed to be grossly negligent:

> Under Michigan's governmental immunity statute, police officers are immune from tort liability for injuries caused by them while acting in the course of their employment if, among other conditions, their tortious conduct was not grossly negligent. Mich. Comp. Laws § 691.1407(1)-(2)(c). Michigan's governmental immunity statute defines "gross negligence" as "conduct so reckless as to demonstrate a substantial lack of concern for whether injury results." Mich. Comp. Laws § 691.1407(2)(c).

---

[5] It is unclear from Plaintiff's Complaint which specific acts Plaintiff claims constitute each separately alleged offense, and Plaintiff's response to Defendant's motion to for summary judgment does little to clarify her claims. However, to the extent that Plaintiff bases her gross negligence claims on the same conduct that forms the basis for her assault and battery claim, the former is subsumed by the latter. *See VanVorous v. Burmeister*, 262 Mich. App. 467, 483-484 (2004) (holding that, to the extent that plaintiff's claim of gross negligence is fully premised on her claim of excessive force, it fails to state a claim as Michigan courts have "rejected attempts to transform claims involving elements of intentional torts into claims of gross negligence.").

*Kostrzewa*, 247 F.3d at 642.

The Michigan Court of Appeals has described gross negligence as "almost a wilful disregard of precautions or measures to attend to safety and a singular disregard for substantial risks." *Shack v. City of Taylor*, 177 F. App'x 469, 474 (6th Cir. 2006) (quoting *Tarlea v. Crabtree*, 263 Mich. App. 80, 89 (2004)). In *Shack*, the detainee was highly intoxicated and officers were aware that he was having trouble maintaining his balance, evidenced by the fact that he had to be supported by officers when walking to the booking room at the jail. *Id*. at 470. In part due to his inebriated state, officers decided not to process him immediately and placed him in a detoxification cell. Although the cell was monitored with a video camera, unbeknownst to officers, Shack fell and hit his head on a concrete wall. Shack eventually "fell asleep" and appeared to officers to be "snoring" throughout the night when officers went to check on him. Several hours later, when officers went to wake him, he was dead. *Id*. After finding that the officer's conduct did not amount to deliberate indifference under 42 U.S.C. § 1983, the court also rejected plaintiff's gross negligence claim:

> Here, no reasonable person could find Defendants grossly negligent in leaving Schack sitting in the detoxification cell. A reasonable person, even having anticipated Schack's attempting to stand, would not likely have anticipated the degree of harm caused, and nothing about Schack's placement in the cell indicates "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." Mich. Comp. Laws § 691.1407(7)(a).

177 F. App'x at 474.

### 1. Leaving Plaintiff situated in the back seat of the patrol car so that she was unable to stabilize herself, resulting in her falling sideways and hitting her head

According to Plaintiff, after her legs were in the car her "butt [was] sitting on the back seat" but she was leaning to the side and couldn't get herself upright without the use of her hands." (Def.'s Mot. Ex. 1, McColman Dep. 50-51.) According to the testimony of Deputy Doan, Plaintiff

was "sitting kind of sideways in the seat. Her feet weren't all the way on the floor but she wasn't totally sideways." (Def.'s Mot. Ex. 6, Doan Dep. 29.) Deputy Doan testified that he placed Plaintiff this way because he thought she would be unable to get her feet and legs around and under the cage of the patrol car because of her prostheses. (*Id*. at 47-48.) Deputy Doan testified that Plaintiff never mentioned feeling unstable on the seat or being unable to maintain her balance in that position when he began the transport to the jail. (*Id*. at 30-31.) When the patrol car went around a corner less than a block from the place of arrest, Plaintiff, who claims she was unable to stabilize herself without the use of her arms or her legs, fell over and claims that she hit her head on something in the back seat of the car. (*Id*. at 51.) Plaintiff testified that she blacked out at this point from the pain in her wrists and the pain from hitting her head. The next thing Plaintiff remembers is waking up at the hospital. (*Id*. at 52.)

There is no indication that Plaintiff informed Deputy Doan that she was in an unstable position in the back seat of the car. Nor is there any indication or claim that Deputy Doan intentionally or recklessly drove the vehicle to precipitate further injury to Plaintiff. In fact, Deputy Doan had proceeded only about one block when Plaintiff fell over and he stopped immediately upon hearing a slight thump. (Def.'s Mot. Ex. 5, Incident Report p. 3.) There is no evidence or even a claim that Deputy Doan "drove recklessly" or displayed a "wilful disregard" for whether Plaintiff sustained an injury.

Plaintiff offers the testimony of Sergeant Hernandez, who did not assist Deputy Doan in situating Plaintiff in the back of the car, but testified in response to a hypothetical that a driver of a vehicle with a double amputee in the back seat with her hands handcuffed behind her back might know that the person so situated might have trouble maintaining her balance and that such a person

possibly should have been secured so she would not harm herself. (Def.'s Mot. Ex. 7, Hernandez Dep. 25-26.) However, even if Deputy Doan had foreseen that Plaintiff might tip over in the back of the vehicle, no reasonable officer would have concluded that tipping over in that situation presented a substantial risk of injury. *Shack*, 177 F. App'x at 474 (quoting the Michigan Court of Appeals' definition of gross negligence as "a singular disregard for substantial risks."). In fact, the injuries which Plaintiff alleges she sustained as a result of tipping over in the back seat of the car amount to some "redness on her scalp." (Def.'s Mot. Ex. 1, McColman Dep. 82-83.) Moreover, this was not just "any double amputee" to Deputy Doan, who recognized Plaintiff shortly after pulling her over the night of the arrest as the double amputee he had encountered a couple of weeks earlier on a domestic dispute call. Based on his observations during that prior incident of Plaintiff's abilities to get around "just fine" with her two prosthetic legs, Deputy Doan could reasonably have concluded that Plaintiff's mobility or stability while seated in the back of the car was not particularly affected by her prosthetic legs. (Def.'s Mot. Ex. 6, Doan Dep. 13-18.)

Deputy Doan testified that when he placed Plaintiff sideways on the seat she appeared to be stable and she never voiced a concern that she was in an unsafe or unstable position. In the instant case, there is no claim that Deputy Doan was driving erratically or intentionally trying to toss Plaintiff about the back seat. In fact, when Deputy Doan realized that Plaintiff had fallen in the back seat and she was not responding to his questions, he immediately stopped the car to check on her and, on advice after a call to Officer Hernandez, rerouted to the hospital. Plaintiff has provided the Court with no authority for the proposition that an officer's failure to secure a handcuffed arrestee in the back of the patrol car to prevent them from tipping sideways when the car turns a corner constitutes gross negligence. Given the totality of these circumstances, the Court concludes that

Deputy Doan's decision to leave Plaintiff situated sideways in the back of the patrol car on the drive to the jail was objectively reasonable. There is no indication that Deputy Doan's conduct was "so reckless as to demonstrate a substantial lack of concern for whether injury results." In fact, Deputy Doan's prompt response after hearing a "slight thump" and rerouting to the hospital indicates to the Court just the opposite intent. The Court concludes that Deputy Doan was not grossly negligent in failing to situate Plaintiff differently in the back of the patrol car for transport to the jail.

### 2. Failing to monitor Plaintiff at the hospital to prevent her falling off of the exam table

Plaintiff's claim as to events that occurred in the emergency room the night of her arrest are particularly vague. Plaintiff states in her responsive brief: "Furthermore the activities that occurred in the hospital would be tantamount to gross negligence." (Pl.'s Resp. 17.) Plaintiff goes on to state that when she went to adjust her prosthesis as she was sitting on the exam table, she fell off the table and was unable to break her fall due to being handcuffed behind her back. She claims to have suffered an injury to her elbow as a result of the fall.

Whatever Plaintiff's claims may be with respect to this event, and the Court will not struggle to divine a claim, there is no question that Deputy Doan, the only Defendant in this case, was in a different part of the emergency room filling out paperwork when Plaintiff fell off the exam table. Not only was Deputy Doan absent when Plaintiff fell off of the exam table, but he had appointed another officer, Deputy Stoyan, to monitor Plaintiff while Deputy Doan went to fill out the paperwork for Plaintiff's blood draw. (Def.'s Mot. Ex. 5, Incident Report p. 3-4; Def.'s Mot. Ex. 9, Stoyan Dep. 17.)

To be liable under Mich. Comp. Laws § 691.1407(2)(c) for grossly negligent conduct, the actor's conduct must have been the proximate cause of the injury or damage. *Robinson v. City of*

*Detroit*, 462 Mich. 439, 462 (2000). The "proximate cause" is "[t]he one most immediate, efficient, and direct cause of the plaintiffs' injuries . . . ." (*Id*.) There is no dispute that Deputy Stoyan, who is not a defendant in this case, was the officer standing by Plaintiff's exam room while Deputy Doan went to fill out the paperwork for Plaintiff's blood draw. The Court notes that the most immediate cause of Plaintiff's fall off of the exam table was Plaintiff herself. In any event, the Court concludes that Plaintiff has offered no evidence in support of her claim that Deputy Doan, who arranged for another officer to monitor Plaintiff while he filled out paperwork in another area of the hospital, was grossly negligent in somehow preventing Plaintiff's fall from the exam table.

### C. Assault and Battery (Count III)

It is unclear from Plaintiff's Complaint what conduct she claims constituted an assault and battery and she does not address this claim at all in her responsive brief. Under Michigan law, an assault is "an attempt to commit to battery or an unlawful act which places another in reasonable apprehension of receiving an immediate battery." *People v. Nickens*, 470 Mich. 622, 661 (2004). A battery is "an intentional, unconsented and harmful or offensive touching of the person of another, or of something closely connected with the person." *Id.* A governmental employee is immune from liability for intentional torts if he is acting within the scope of his authority, acted in good faith and was performing discretionary acts. *Grawey v. Drury*, 567 F.3d 302, 315 (6th Cir. 2009). "The critical inquiry is whether [the employee's] actions were taken in good faith." *Id.* "Good faith" in this context is defined as "without malice." *Miller*, 606 F.3d at 254 (quoting *Odom v. Wayne County*, 482 Mich. 459 (2008)).

To the extent that Plaintiff's assault and battery claim is premised upon the same actions that form the basis for her § 1983 claims, "[in Michigan] the standard for governmental immunity on

state law claims is essentially identical to that of qualified immunity on § 1983 claims . . . ." *Marvin*, 509 F.3d at 252. "Specifically, a police officer may use reasonable force when making an arrest. Therefore, the measure of necessary force is that which an ordinarily prudent and intelligent person, with the knowledge and in the situation of the arresting officer, would have deemed necessary." *Id. See also VanVorous,* 262 Mich. App. at 483 (holding that to find for plaintiff on her assault and battery claim, which was premised on the same conduct as her section 1983 excessive force claim, "our courts would have to determine that the officers' actions were not justified because they were not objectively reasonable under the circumstances."). Thus, to the extent that Plaintiff's assault and battery claims are premised on the same facts as her argument that Deputy Doan used excessive force in pulling Plaintiff across the back seat of the car, Deputy Doan is entitled to governmental immunity on such a claim.

To the extent that Plaintiff bases her assault and battery claim on Deputy Doan's conduct in placing Plaintiff in the back seat of the patrol car in an unstable position, the Court concludes that Deputy Doan is entitled to governmental immunity on this claim. There is absolutely no evidence that Deputy Doan acted in bad faith and in fact, as discussed above with respect to Plaintiff's gross negligence claim, Deputy Doan's actions in response to Plaintiff's falling over sideways in the back seat of the car indicate just the opposite intent. Deputy Doan is entitled to summary judgment on Plaintiff's assault and battery claim to the extent it is premised on Deputy Doan's actions in placing her in the back seat of the patrol car.

Plaintiff's claims surrounding her fall from the exam table do not involve any touching or attempted touching by Deputy Doan and therefore could not constitute a claim for assault and battery. In any event, Deputy Doan would be entitled to governmental immunity on such a claim

because Plaintiff could not demonstrate the element of bad faith necessary to defeat immunity.

## IV.    CONCLUSION

Accordingly, the Court GRANTS Deputy Doan's motion for summary judgment and dismisses Plaintiff's Complaint with prejudice.

IT IS SO ORDERED.


S/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  November 1, 2010

### CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on November 1, 2010.


S/Denise Goodine
Case Manager